(280 P.3d 824)
No. 106,605

STATE OF KANSAS, *Appellant*, v. KALA JONES, *Appellee*.

867

868

Opinion filed June 29, 2012.

*Linda Lobmeyer* and *Seth Lowry*, assistant county attorneys, *John P. Wheeler, Jr.*, county attorney, and *Derek Schmidt*, attorney general, for appellant.

*Therese Marie Hartnett*, of Western Regional Public Defender's Office, of Garden City, for appellee.

Before GREENE, C.J., GREEN and BUSER, JJ.

GREENE, C.J.: The State of Kansas perfects this interlocutory appeal of the district court's order suppressing evidence resulting from a warrantless search of a vehicle incident to a traffic stop, which evidence led to charges against Kala Jones for possession of cocaine and possession of drug paraphernalia. Concluding that

there was no reasonable suspicion to justify further detention of the suspect and that the detention for a drug dog to arrive unreasonably extended the suspect's detention, we affirm the district court's suppression of evidence found after the drug dog alerted on the suspect's vehicle.

## FACTUAL AND PROCEDURAL BACKGROUND

In the early morning hours of November 16, 2010, Officer Bill Powers of the Garden City Police Department observed a vehicle driven by Kala Jones and stopped the vehicle for "driving erratically" or "the actions of driving odd." These actions included the failure to use a turn signal. When the officer approached Jones, he noticed that "she was angry. She was upset that I had stopped her. Her mouth appeared to be dry, to me, like she had cotton mouth. And her words were slurred." He did not smell alcohol or drugs on the driver's person or in the vehicle. The officer's testimony sometimes also mentioned bloodshot eyes, but his testimony was not consistent on this, and his written report failed to mention this observation. The officer also observed the corner of an empty plastic sandwich bag inside the vehicle.

Based upon these observations, the officer did not proceed with an investigation for driving under the influence of drugs or alcohol, but rather sought the driver's identification and then asked her to step from the vehicle. When the driver denied the officer permission to search the vehicle, the officer contacted his supervisor, Sergeant Martinez, who arrived at the scene "probably 15 minutes after" the vehicle was stopped. After the officer conferred with his supervisor, they decided to ask all vehicle occupants to exit the car and to call for a K-9 unit. The precise time that elapsed waiting for the K-9 unit is in dispute, but the elapsed time was apparently somewhere between 20 and 40 minutes based upon the competing testimony of the officer and Jones. (We also note that the officer's testimony regarding the elapsed times during various stages of his detention of Jones were not consistent.) The vehicle stop occurred no earlier than 12:40 a.m. and no later than 2 a.m., and Jones was booked at the detention center about 3 a.m.

At the traffic stop, the K-9 unit alerted on the vehicle, and drugs and paraphernalia were ultimately found, leading to the charges against Jones. The district magistrate judge initially denied the suppression motion, but the district court granted the suppression motion. The district court's memorandum opinion made no findings on the elapsed time of the detention, but it related the conflict in the evidence as noted above. The key findings or conclusions of the district court were:

"13. It is this Court's finding, based upon the testimony, that the officer was playing a hunch and the traffic stop and the ticket for no use of a turn signal was merely a pretext to hold the Defendant illegally for as long as necessary to get a K-9 unit there in the hope of securing a probable cause finding for searching the vehicle.

"14. If a traffic citation was justified, the officer had only as long as it was reasonably necessary to write the ticket and then release the Defendant to go on her way. Obviously since no ticket was ever wrote, it adds weight to the claim that the stop was only a pretext and that the officer violated the Defendant's constitutional right against unreasonable search and seizure[ ]."

The State timely appeals this ruling.

*Standards of Review*

In reviewing an order suppressing evidence, an appellate court generally reviews the factual findings underlying the district court's suppression decision using a substantial competent evidence standard and the ultimate legal conclusion drawn from those factual findings by applying a de novo standard. This court does not reweigh the evidence. *State v. Ransom*, 289 Kan. 373, 380, 212 P.3d 203 (2009). This court ordinarily presumes the district court found all facts necessary to support its judgment, unless the record on appeal fails to support that presumption. *State v. Vaughn*, 288 Kan. 140, 143, 200 P.3d 446 (2009); *Hodges v. Johnson*, 288 Kan. 56, 65, 199 P.3d 1251 (2009). The State has the burden of proving that a search or seizure was lawful. *State v. Anderson*, 281 Kan. 896, 901, 136 P.3d 406 (2006).

Whether reasonable suspicion exists is a question of law and is reviewed de novo. In reviewing an officer's belief of reasonable suspicion, this court determines whether the totality of the circum-

stances justified the detention. *State v. Walker*, 292 Kan. 1, Syl. ¶¶ 5, 6, 251 P.3d 618 (2011).

## DID THE COURT ERR IN SUPPRESSING THE EVIDENCE RESULTING FROM THE K-9 ALERT DURING THE DETENTION OF JONES?

The State challenges the district court's suppression decision, arguing that the officer "had developed independent reasonable suspicion to extend the duration of the traffic stop and investigate a possible drug violation." We review the general principles governing traffic stops and the development of reasonable suspicion as a part thereof.

### General Principles

The Fourth Amendment to the United States Constitution provides that the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures shall not be violated." U.S. Const. amend. IV. A traffic violation provides an objectively valid reason for conducting a traffic stop; thus, an initial seizure of the driver is not deemed unreasonable, even if the stop is pretextual. *State v. Moore*, 283 Kan. 344, 350, 154 P.3d 1 (2007).

During a routine traffic stop, a law enforcement officer may request a driver's license, proof of insurance, and vehicle registration; run a computer check; and issue a citation. When the driver has produced a valid license and proof that he or she is entitled to operate the car, the driver must be allowed to proceed on his or her way, without being subject to further delay by the officer for additional questioning. In order to justify a temporary detention for further questioning, the officer must have either consent or reasonable suspicion of the presence of illegal drugs or of some other serious crime. See *State v. Mitchell*, 265 Kan. 238, Syl. ¶ 4, 960 P.2d 200 (1998).

An officer's inquiries or actions unrelated to the justification for an initial traffic stop do not convert the stop into an unlawful seizure so long as they do not measurably extend or prolong the stop. In the absence of consent, an officer may expand the duration of

the detention beyond the initial stop when the responses of a detainee and the circumstances relating to the stop give rise to suspicions of a crime unrelated to the traffic offense. The officer may then satisfy those suspicions, graduating the police response to the demands of the situation. See *State v. Morlock*, 289 Kan. 980, 995-96, 218 P.3d 801 (2009). But an officer may expand the detention beyond the purposes of the initial stop *only* if there is an objectively reasonable and articulable suspicion that criminal activity was or is taking place. See *State v. Thomas*, 291 Kan. 676, Syl. ¶ 8, 246 P.3d 678 (2011).

Reasonable suspicion is a less demanding standard than probable cause and requires a showing of considerably less than a preponderance of the evidence, but the United States Constitution requires at least a minimal level of objective justification. The officer must be able to articulate more than an inchoate and unparticularized suspicion or hunch of possible criminal activity. *Thomas*, 291 Kan. at 688. In assessing factors articulated to support reasonable suspicion, we do not prioritize or pigeonhole each factor, but rather determine whether the totality of the circumstances justifies further detention. *State v. DeMarco*, 263 Kan. 727, 734-45, 952 P.2d 1276 (1998) (pigeonholing prohibited); see *State v. Thompson*, 284 Kan. 763, Syl. ¶ 20, 166 P.3d 1015 (2007) (no one factor legally dispositive). Quantity and quality are considered in the totality of the circumstances or "the whole picture" that must be taken into account when evaluating whether there is reasonable suspicion. *DeMarco*, 263 Kan. at 735.

## Application

Here, the officer was asked a direct question about the basis of any suspicion. At the initial suppression hearing before the magistrate judge, he stated, "She had cotton mouth, dry mouth. . . . Her eyes were bloodshot. Her words were slurry. I saw a clear plastic baggy inside of the truck." At the suppression hearing before the district court, however, when asked what he observed that was "out of the ordinary" about Jones, he indicated, "[J]ust slurred speech and the cotton mouth" and then added his observation of "a clear plastic baggy." At no time did the officer indicate that his

reasonable suspicion was based in part on the driving violations that formed the basis of his vehicle stop. Based on these factors, the officer believed "there was the presence of controlled substances within the truck." He did not proceed with a DUI investigation.

Were these articulated factors sufficient to create a reasonable suspicion that there were controlled substances within the truck? Critical to our analysis is the fact that we are not examining whether these factors would have supported reasonable suspicion of DUI, but rather whether they supported reasonable suspicion of transporting controlled substances. Also critical to this determination is that we cannot consider the other factors urged by the State such as bloodshot eyes or erratic driving because they were not articulated by the officer to the district court as a basis for his extended detention of Jones. See *State v. Johnson*, 293 Kan. 1, Syl. ¶ 4, 259 P.3d 719 (2012) (officer must be able to *articulate* reasonable suspicion beyond hunch of criminal activity); *State v. Blaylock*, No. 104,146, unpublished opinion filed January 28, 2011 (State cannot bootstrap different bases for reasonable suspicion beyond those articulated by the officer making the stop).

Although our dissenting colleague would apparently remand for the arresting officer to clarify his testimony regarding the story of Jones' erratic driving—a fact that he failed to mention as a basis for his stop—we respectfully disagree that any remand is appropriate. Our refusal to consider Jones' alleged erratic driving does not convert our analysis into a subjective test, nor does it somehow constitute "de novo fact finding." We have made no findings on the issue, and we simply adhere to three important rules in such cases: (1) The State has the burden of proof in these matters, and we decline to provide it with a second bite of the apple if the officer has had adequate opportunity to explain the basis for a vehicle stop and has failed to articulate other facts that *might* have supported the stop. See *State v. Greever*, 286 Kan. 124, 133, 184 P.3d 788 (2007); (2) We have always focused on the officer's "ability to articulate" his or her basis for the stop; *i.e.*, no post-hoc bootstrapping is permitted. See *Blaylock*, slip op. at 3; and (3) Analysis of the officer's articulation of the factual basis has nothing to do with the

subjectivity that we seek to avoid; we look at the purported factual basis in determining whether an objective officer would have a reasonable and articulable suspicion—and we avoid the specific officer's subjective thought process. See *United States v. Foreman*, 369 F.3d 776, 781 (4th Cir. 2004). We must also avoid embellishing the officer's account after the fact or remanding with clear directions or implication that the erratic driving fact should be articulated on a second attempt by the arresting officer.

The observation of slurred speech and "cotton mouth" may—to an experienced officer—indicate that alcohol or drugs have been recently consumed. We have often found that slurred speech—coupled with other factors—may support reasonable suspicion that one is intoxicated or has been driving under the influence. See, *e.g., State v. Kendall*, 274 Kan. 1003, 1013, 58 P.3d 660 (2002) (slurred speech is an indicator suspect is intoxicated); *State v. Wahweotten*, 36 Kan. App. 2d 568, 591, 143 P.3d 58 (2006), *rev. denied* 283 Kan. 933 (2007). The State cites no caselaw, however, to suggest that either of these factors would tend to support a suspicion *that the vehicle is transporting controlled substances*. Our review of applicable caselaw has revealed only some indication that the factor of intoxication may be considered in determining probable cause the person may be possessing drugs *on his or her person*. See *State v. Ramirez*, 278 Kan. 402, 407-08, 100 P.3d 94 (2004). We view this as distinct from a factor indicating transportation of drugs within the vehicle.

The observation of the empty plastic sandwich baggy is not an impressive factor. See *Ramirez*, 278 Kan. at 408 (quoting 2 LaFave, Search and Seizure § 3.6, pp. 299-301 [1996] [observation of person in possession of certain packaging which on other occasions has been found to conceal narcotics does not, standing alone, constitute probable cause]). Granted, contraband is frequently transported in such baggies, but the State cites no caselaw to suggest that the presence of an *empty* plastic baggy in a vehicle may be considered a factor tending to support a reasonable suspicion that the vehicle is transporting *other* controlled substances. We are to evaluate such factors employing common sense and ordinary human experience (see *United States v. Wood*, 106 F.3d 942, 946

[10th Cir. 1997]); such plastic sandwich baggies have a multitude of innocent uses and are frequently utilized in packing innocent substances for travel purposes. Moreover, if we accord reasonable deference to a law enforcement officer's ability to distinguish between innocent and suspicious activity (see *Walker*, 292 Kan. 1, Syl. ¶ 6), we believe that the *empty* baggy to a trained law enforcement officer would tend more often to support the fact that drugs *had already been consumed* or thrown out of the vehicle rather than a suspicion that *other* controlled substances were still in the vehicle. Again, we are not impressed with this factor. See *State v. Armstrong*, No. 93,941, 2006 WL 1668767, at *6 (Kan. App. 2006) (unpublished opinion) (citing *State v. Schneider*, 32 Kan. App. 2d 258, 264, 80 P.3d 1184 [2003] [courts have been reluctant to place too much stock in the possession of items which are legal to possess]).

The State has also urged us to consider how reasonable suspicion is "strengthened by Officer Powers' extensive training and experience in investigating drug crimes." Although we have been willing to give some degree of deference to the officer's ability to distinguish suspicious activity, we will not abdicate our role in making a de novo legal determination of reasonable suspicion. As our Supreme Court has cautioned:

"We do not advocate a total, or substantial, deference to law enforcement's opinion concerning the presence of reasonable suspicion. The officers may possess nothing more than an 'inchoate and unparticularized suspicion' or 'hunch' of criminal activity. [Citation omitted.] Such a level of deference would be an abdication of our role to make a de novo determination of reasonable suspicion." *Moore*, 283 Kan. at 359.

Evaluating the factors within the totality of the circumstances, they may have been sufficient to support a further investigation for DUI. This is not the question before us, however, and it was not the course chosen by this officer; instead, he chose to abandon any investigation of DUI and detain Jones for further investigation of transporting controlled substances—including the employment of a drug-sniffing dog to examine the vehicle. We simply cannot conclude that the factors articulated would support reasonable suspicion, especially given the State's burden in the matter. For this

reason alone, the district court did not err in suppressing the evidence.

## Even If Reasonable Suspicion Had Existed, Did the Officer Unreasonably Extend the Detention?

Even if we had found that reasonable suspicion existed to support the extension of Jones' detention, the next step would have necessarily been to determine whether the detention was reasonably extended or was of a lawful duration. See *State v. Coleman*, 292 Kan. 813, 821, 257 P.3d 320 (2011). For purposes of avoiding remand for consideration in the event that our views on reasonable suspicion do not prevail, we turn to this inquiry.

Our dissenting colleague suggests this issue was not raised in district court or on appeal and should not be considered. Again, we respectfully disagree. The argument first appears in Jones' motion to suppress, where her counsel stated that "[e]ven if the initial contact was appropriate, the detention exceeded the initial scope of the stop when Officer Powers continued to detain Ms. Jones . . . ." At the initial motion hearing, Jones' counsel stated, "At that point Officer Powers should have let my client go home. However, . . . we're not sure exactly how long she was held. . . . This was a very long detention." At the second suppression hearing, Jones' counsel stated, "An officer cannot detain a person once they provide these valid documents on a mere hunch or a suspicion. There has to be something more. . . . It wasn't just a short stop either." On appeal, the State argues that "the amount of time that elapsed under either Officer Powers' or the Defendant's version of event did not impermissibly extend the duration of the traffic stop beyond its lawful scope." Jones' appellate brief responded that "[w]hether she was held almost an hour or two hours is not the issue. Without reasonable suspicion that a crime was being committed, Officer Powers had no right under the law to detain her at all . . . ." Clearly, this issue was raised below and has been argued on appeal.

A traffic stop may not exceed the duration necessary to carry out the purpose of the stop. *Morlock*, 289 Kan. at 988-89. Detaining a driver for even a few minutes in order to allow a drug-sniffing dog to arrive unreasonably extends the detention when the officer did

not need additional time to ask exploratory questions or to write a traffic citation. See *Coleman*, 292 Kan. at 822; *Mitchell*, 265 Kan. 238, Syl. ¶ 3.

Here, according to the officer's initial testimony, Jones' detention was extended at "5 to 10 minutes" for the arrival of the officer's supervisor, and "maybe 15 to 20 minutes" for the arrival of the drug dog, or *at least* 20 to 30 minutes. Our dissenting colleague cannot find support for these facts and prefers to rely on the officer's second version of the timing, wherein the officer stated that the entire time of detention was "15, 20 minutes tops." The dissenter then suggests once again that we have engaged in "de novo fact finding." We respectfully disagree. We have simply taken the officer at his word and analyzed the encounter based on the best possible scenario for law enforcement: Jones was detained for at least 20 to 30 minutes. If this detention cannot survive scrutiny, there is little reason to remand for further fact finding, especially because the State has conceded that "the traffic stop of the defendant's truck was extended beyond the time normally allotted for a traffic stop for failure to use a turn signal."

A detention of 20 to 30 minutes is within 5 minutes of the duration of the unlawful detention in *Coleman*, which was 35 minutes "while he waited for backup officers and, eventually, a parole officer to arrive." 292 Kan. at 822. Again, there our Supreme Court clearly and unequivocally stated that "[d]etaining a driver for even a few minutes in order to allow a drug-sniffing dog to arrive unreasonably extends the detention when the officer did not need additional time to ask exploratory questions or to write a traffic citation." 292 Kan. at 822. Here, the officer did not need to nor did he ask further questions of Jones, and he elected to abandon an investigation for DUI or to write a citation for a traffic offense— he detained Jones while he waited for his supervisor and then the drug-sniffing dog to arrive. Under the controlling precedent of *Coleman*, we hold that the detention of Jones was unreasonably prolonged and this alone would justify suppression of the evidence ultimately discovered through use of the K-9 unit, even if the officer had gained reasonable suspicion that the vehicle may have contained controlled substances. Here, we note with respect that

our dissenter overlooks the fact that even if there was any reasonable suspicion developed at all, it may have supported an investigation for DUI, but not for possession of controlled substances, and DUI is not generally pursued by using a drug-sniffing dog.

The State has cited two federal cases to support its argument that the time that elapsed awaiting the drug dog did not impermissibly extend the duration of the traffic stop beyond its lawful scope. Federal Circuit Court of Appeals cases are not binding on this court, but they can be considered persuasive. *Thompson*, 284 Kan. at 801. In *United States v. Rosborough*, 366 F.3d 1145 (10th Cir. 2004), a canine unit arrived approximately 45 minutes into a consensual search of the vehicle; but this is to be distinguished from the case before us both because that search *was consensual* and the officers were in the process of searching during the entire time while awaiting the canine unit. In *United States v. White*, 42 F.3d 457 (8th Cir. 1994), a canine unit arrived 1 hour and 20 minutes after being summoned during a consensual search of a vehicle, but—again—*the search was consensual* and was also supported by a specific reasonable suspicion that boxes found in the vehicle contained drugs. We are not persuaded that either of these cases should cause this court to depart the controlling precedent of our own Supreme Court in *Coleman*.

We note that this outcome is identical to that of the district court, albeit for different reasons. The district court apparently relied in part—if not entirely—on the pretextual nature of the initial stop. This was error because a pretextual stop is not improper so long as there is an objectively valid reason to effectuate it. See *Anderson*, 281 Kan. at 901. Therefore, we affirm the district court's judgment on somewhat different grounds, as is our prerogative. See *State v. Murray*, 285 Kan. 503, 533, 174 P.3d 407 (2008).

Affirmed.

\* \* \*

BUSER, J., dissenting: I dissent from the majority's affirmance of the district court's ruling suppressing the cocaine and drug paraphernalia found in Jones' pickup truck. As discussed below, given the district court's inadequate findings of fact and conclusions of

law, I am unable to properly analyze the search and seizure issue presented to our court without weighing conflicting evidence, evaluating witness credibility, and redetermining questions of fact. Of course, these are analytical endeavors which are inappropriate given the properly limited scope of an appellate court's review. See *State v. Marx*, 289 Kan. 657, 660, 215 P.3d 601 (2009).

When the record on review does not support a presumption that the trial court found all the facts necessary to support the judgment, this court will remand the case for additional findings and conclusions even though none of the parties objected in the trial court or in this court. See *State v. Vaughn*, 288 Kan. 140, 143, 200 P.3d 446 (2009).

Accordingly, I would reverse the suppression ruling and remand to the district court with directions to reconsider the matter after making findings of fact and conclusions of law sufficient to allow appellate review.

### WAS THERE REASONABLE SUSPICION TO EXTEND THE DETENTION TO INVESTIGATE WHETHER DRUGS WERE IN THE PICKUP TRUCK?

At the outset, I agree with my colleagues that the district court's legal basis to suppress the evidence was erroneous. According to the majority, in suppressing the evidence, the district court "apparently relied in part—if not entirely—on the pretextual nature of the initial stop. This was error because a pretextual stop is not improper so long as there is an objectively valid reason to effectuate it. See [*State v.*] *Anderson*, 281 Kan. [896,] 901[, 136 P.3d 406 (2006)]." 47 Kan. App. 2d at 878. I agree. Of note, this erroneous legal conclusion was the only basis provided by the district court in support of its suppression order.

The majority then formulates its own conclusions of law based on "somewhat different grounds" than the district court. 47 Kan. App. 2d at 878. Indeed, my colleagues conclude for the first time in this litigation that "there was no reasonable suspicion to justify further detention of the suspect" during the traffic stop. 47 Kan. App. 2d at 869.

The district court, however, did not mention—let alone analyze—the critical issue of whether Officer Powers had a reasonable

suspicion that Jones (apart from the traffic violation) had committed, was committing, or was about to commit a crime to justify a further extension of her detention. See *State v. Coleman*, 292 Kan. 813, Syl. ¶ 2, 257 P.3d 320 (2011). And perhaps as a consequence, the district court did not make factual findings essential to support the legal determination of whether there was reasonable suspicion to extend the traffic stop.

On appeal, however, and without the benefit of the district court's legal analysis or related factual findings, my colleagues simply conduct a de novo review of the facts in the record, select those which they find appropriate to their analysis, and arrive at the same suppression decision as the district court but on two entirely different legal bases.

Here is the problem: The material facts regarding the traffic stop, Jones' detention, Officer Power's reasonable suspicion to extend the duration of the traffic stop to investigate the possession of drugs, and the period of time to procure the drug dog were either not mentioned by the district court or were controverted. And with regard to the controverted facts, the district court did not *resolve* those factual disputes by making adequate findings of fact.

For example, the district court did not make any findings regarding whether Jones' driving was erratic immediately prior to the traffic stop, and whether, if erratic, her driving was a valid factor leading an objective officer to have a reasonable suspicion to suspect there were drugs in the pickup truck. My colleagues, however, are not constrained by the district court's omission of sufficient factual findings as they conduct their own de novo factual analysis.

Based on their independent review of the record testimony, the majority finds that "[a]t no time did the officer indicate that his reasonable suspicion was based in part on the driving violations that formed the basis of his vehicle stop." 47 Kan. App. 2d at 872-73. Moreover, my colleagues state: "Also critical to this determination is that we cannot consider the other factors urged by the State such as . . . erratic driving because they were not articulated by the officer to the district court as a basis for his extended detention of Jones." 47 Kan. App. 2d at 873. As a result, my colleagues do not consider Jones' erratic driving as a factor tending to support

a finding of reasonable suspicion to believe there were drugs in the vehicle.

Before I address these factual findings, one legal point should be addressed. An appellate court should consider erratic driving under an objective standard rather than the subjective standard applied by my colleagues, who would require Officer Powers to *personally* articulate erratic driving as a basis for his extended detention of Jones. In other words, the question is not what Officer Powers thought, but what an objective officer in Officer Powers' position would have thought based on the known facts. See *State v. Johnson*, 293 Kan. 1, 5, 259 P.3d 719 (2012) (asking whether an " 'an objective officer would have a reasonable and articulable suspicion' "); see also *United States v. Foreman*, 369 F.3d 776, 781 (4th Cir. 2004) ("Because reasonable suspicion is an objective test, we examine the facts within the knowledge of [the officer] to determine the presence or nonexistence of reasonable suspicion; we do not examine the subjective beliefs of [the officer] to determine whether he thought that the facts constituted reasonable suspicion.").

Turning now to the facts, Officer Powers testified he "saw the vehicle driving erratically" as he followed it in his patrol car. According to the officer, "we were zigzagging back and forth through the neighborhood." In particular, Officer Powers observed Jones turning corners abruptly and then going in the opposite direction. On one occasion, Jones signaled to turn in one direction but then turned in the opposite direction. Based on his training and experience, Officer Powers believed that Jones "was trying to elude me." According to the officer, these driving behaviors *raised my suspicions even higher*" than did the simple traffic violations he observed. (Emphasis added.)

On cross-examination, the following colloquy established the link between Officer Power's observation of Jones' erratic driving and his suspicion that the pickup truck contained drugs:

"A. The seeing of the plastic baggy, ma'am, made me indicate that it was more leaning towards drugs than alcohol.

"Q. Was the—did you see the contents of the plastic bag?

"A. The plastic bag was empty at that time.

"Q. So it wasn't—there was nothing in plain view that would give you probable cause at that time?

"A. I had suspicion that there was something inside of the vehicle by the seeing of the bag.

"Q. You had a hunch that there was something in the vehicle—

"A. No, ma'am. I had more than a hunch because of the bag. It's not a normal— it's not out of reason and it's happened to me in the past that people, *when driving erratic such as that*, will discard items, like under the seat." (Emphasis added).

In short—and in direct contradiction to my colleagues' de novo factual finding—one could find that Officer Powers considered Jones' erratic driving as an attempt to elude the officer to prevent or at least delay the traffic stop in order to hide the drugs previously contained in the plastic bag. Thus, one could conclude that Jones' erratic driving was a factor in the reasonable suspicion calculus.

While the testimony of Officer Powers, in my estimation, could support a finding that he did consider Jones' erratic driving as a factor in formulating his belief that her pickup truck contained drugs, I must candidly concede there is yet another factual scenario not mentioned by the district court or my colleagues that deserves our consideration: Jones did not drive erratically at all.

At the suppression hearing, Jones directly contradicted Officer Powers when she testified, without equivocation, that immediately prior to the stop she was "driving regular" and "wasn't doing anything wrong." If Jones' testimony is true, Officer Powers either lied or was sorely and repeatedly mistaken. And, as a result, a reasonable factfinder would have every reason to doubt the rest of the officer's testimony. If Jones' testimony is true, her driving could not have been a factor that contributed to an objectively reasonable officer believing that the pickup truck contained drugs. On the other hand, if Officer Powers' testimony is true, then Jones either lied or was oblivious to her own bizarre driving.

In the determination of whether there was reasonable suspicion to extend the duration of the traffic stop, this thorny factual dispute only gets more tangled. While Officer Powers testified that Jones was nervous and displayed anger upon his approach, Jones specifically denied she was nervous or angry at the time of the car stop. Of course, courts may consider a driver's nervousness or anger

when deciding whether an officer had reasonable suspicion to detain a vehicle to obtain a drug dog. See *United States v. Maynard*, 615 F.3d 544, 553 (D.C. Cir. 2010); *United States v. Lebrun*, 261 F.3d 731, 733-34 (8th Cir. 2001); *Laime v. State*, 347 Ark. 142, 159, 60 S.W.3d 464 (2001). The district court, however, did not make a finding resolving these factual disputes. For their part, my colleagues do not mention either Jones' nervousness or anger.

How should an appellate court resolve these controverted factual disputes which have a direct bearing on the ultimate legal conclusion of whether the contraband should have been suppressed? Should we believe Officer Powers or should we believe Jones? And, should we evaluate their credibility from reading words on pages of a transcript rather than seeing and listening to the witnesses in person, which was the opportunity appropriately afforded to the district court?

## DID OFFICER POWERS UNREASONABLY EXTEND THE DETENTION OF JONES TO CONDUCT HIS INVESTIGATION?

Next, for the first time in this litigation, the majority determines there is an alternative legal conclusion which requires suppression of the evidence:

"Here, according to the officer's initial testimony, Jones' detention was extended 5 to 10 minutes for the arrival of the officer's supervisor, and 'maybe 15 to 20 minutes' for the arrival of the drug dog, or *at least* 20 to 30 minutes. . . .

". . . [W]e hold that the detention of Jones was unreasonably prolonged and this alone would justify suppression of the evidence ultimately discovered through use of the K-9 unit, even if the officer had gained reasonable suspicion that the vehicle may have contained controlled substances." 47 Kan. App. 2d at 877.

This holding is also memorialized in Syllabus 12.

Preliminarily, I would not make this ruling for the simple reason that Jones did not raise this legal issue in the district court, the district court did not consider it, and Jones did not raise this issue in her brief or argue it on appeal. In her motion to suppress, Jones never complained about the lengthy detention to procure the drug dog. On appeal, the issue raised was not whether the detention to obtain the drug dog was too lengthy but whether Officer Powers had developed reasonable suspicion to extend the detention *at all*

upon completion of the traffic stop. As noted by my colleagues, Jones emphasized in her brief the fact that the time period to procure the drug dog was "not the issue" because without reasonable suspicion Officer Powers had no legal basis "to detain her at all" for any period of time and for any purpose once the traffic stop concluded.

Two longstanding general rules of law in our state underscore that an appellate court should resist the temptation to, *sua sponte*, seek out and find error when that purported error is not properly presented to the appellate court. First, issues not raised before the trial court generally may not be raised on appeal. *State v. Warledo*, 286 Kan. 927, 938, 190 P.3d 937 (2008). Second, an issue not briefed by the appellant is deemed waived or abandoned on appeal. *State v. Martin*, 285 Kan. 994, 998, 179 P.3d 457, *cert. denied* 555 U.S. 880 (2008). Accordingly, I believe this issue is inappropriate for appellate review.

As to the merits of my colleagues' legal conclusion, there are several problems with their factual findings which undergird their ruling. First, after a thorough search of the record I can find *no evidence* to support the notion that Officer Powers extended Jones' detention for at least 20 to 30 minutes—5 to 10 minutes to await the arrival of his supervisor and maybe 15 to 20 minutes more to await the arrival of the drug dog.

Second, there is substantial competent evidence to the contrary. The district court found that "[t]he time involved in the stop is conflicted." Of course, while very true, this does not establish a factual finding. Still, at least the district judge related his understanding of the separate testimony of Officer Powers and Jones regarding the controverted length of the detention.

With regard to Officer Powers' testimony, the district court stated, "The officer volunteered that statistically his time for writing a ticket runs between 10 and 15 minutes. His time between a stop being made and the arrival of a K-9 dog runs from 15 to 20 minutes." This last finding is not quite accurate. Officer Powers testified the elapsed time of Jones' detention—from the initiation of the traffic stop until the arrival of the drug dog—was not a statistical average but was *actually* 15 to 20 minutes. On direct

examination, Officer Powers testified about the time period of the traffic stop:

"Q. Were any other officers with the Garden City Police Department called out to the scene to assist with the investigation?
"A. Yes.
"Q. And who were those officers?
"A. Scott Ptacek. He's the K-9 officer. Sergeant Martinez, who is my immediate supervisor. And Officer Jennifer Smith.
"Q. And of those three officers that you mentioned, who did you confer with first?
"A. Sergeant Martinez.
"Q. And when Sergeant Martinez arrived, approximately how much time elapsed from the moment of the traffic stop to when you first met with Sergeant Martinez?
"A. That would be in that five-to-ten-minute bracket.
"Q. And what did you—what did you tell Sergeant Martinez?
"A. What I observed, what I saw, and that I would like a police K-9 dog to walk around the vehicle.
"Q. And was a K-9 unit eventually called to assist with the investigation?
"A. It was.
"Q. And who was the officer that responded?
"A. Scott Ptacek.
"Q. And *from the time that you made the traffic stop on the truck to the time that Mr.—Officer Ptacek arrived with his K-9 unit, how much time had elapsed between then?*
"A. *Maybe 15 to 20 [minutes].*
"Q. And, just generally, how much time does it routinely take you on a case involving a traffic infraction to ascertain the identity of the driver and to issue a citation, if any is issued?
"A. They have done a comparison as it pertains to officers, and with myself personally, *I go from 10 to 15 minutes from the time of stop to the completion of the traffic citation.*" (Emphasis added.)

## On cross-examination, Officer Powers reaffirmed his testimony:

"Q. Okay. And then that 15 minutes you just said was before you called for the K-9 patrol?
"A. *That 15 minutes would have been inclusive with stopping the truck, meeting with Sergeant Martinez and the K-9 officer arriving on scene.*
"Q. Okay. I thought you said that it was about 15 minutes until you called for the K-9 patrol?
"A. Then I'm—then I misspoke. *It's a grand total of about—of roughly about 15 minutes. From the time I made the stop, to the time I spoke to my supervisor, to the time the K-9 officer arrived on scene, 15, 20 minutes tops.*" (Emphasis added.)

In short, based on the district court's summarization of Officer Power's testimony, it is reasonable to conclude that, had no reasonable suspicion developed during the traffic stop, Jones would have been detained only 10 to 15 minutes. Moreover, according to Officer Powers, the drug dog was, in fact, at the scene 15 to 20 minutes after the initial stop. There is substantial competent evidence to support the district court's understanding of Officer Powers' testimony.

Given the district court's understanding of Officer Powers' testimony, we can arrive at one of two conclusions. Either Jones was not detained to await the drug dog beyond the longest normal time it takes for Officer Powers to typically conduct an ordinary traffic stop (15 minutes) or she was *additionally* detained only 5 to 10 minutes to allow for the arrival of the drug dog. In either event, according to Officer Powers, only 15 to 20 minutes elapsed from the initial traffic stop until the arrival of the drug dog.

Complicating our fact finding, however, Officer Powers' testimony was directly contradicted by Jones' testimony. As recounted by the district court, Jones testified she was detained at the scene of the traffic stop "between one and two hours." Moreover, as recalled by the district court, Jones claimed that during that time period she was "standing outside waiting on the dog to arrive for 40 minutes." There is substantial competent evidence to support the district court's understanding of Jones' testimony.

Of critical importance, the district court did not find whether the detention was either not extended or extended only 5 to 10 minutes to bring the drug dog to the scene (according to Officer Powers) or whether the detention was extended a lengthy 40 minutes (according to Jones). Perhaps my colleagues' de novo factual finding that the additional detention of "*at least* 20 to 30 minutes" indicates my colleagues believe Jones' testimony and disbelieve Officer Jones' testimony. For my part, however, I am not sure who to believe.

But I am sure of this: Like the district court judge, I would like to have seen the witnesses, heard their testimony, evaluated their credibility, and then determined which witness was telling the truth or lying, which witness had a better memory, or quite simply which

witness' testimony was more coherent and convincing. Unfortunately, sitting as an appellate judge in a judicial center in Topeka, Kansas, some 325 miles from the Finney County District Court, and about 11 months after the suppression hearing, this is simply not possible. And because I was not the district court judge (who is still fully capable of making these factual determinations and then reconsidering his legal conclusion), it would be improper and impossible for me to decide these disputed material facts on this cold record.

What is proper and possible, however, is to reverse the district court's conclusion of law which my colleagues and I agree was erroneous. Then, because the district court was in the best position to evaluate the credibility and accuracy of the witnesses and their highly controverted testimony, we should remand this case with directions that the district court make the necessary factual findings, reconsider its conclusion of law, and provide the litigants and our court with its best legal judgment regarding whether the evidence should be suppressed. This is a suitable remedy for situations, like this one, where the district court's factual findings or legal conclusions are insufficient for appellate review. See *Vaughn*, 288 Kan. at 143.

Finally, on a purely legal matter, the majority cites *Coleman* and *State v. Mitchell*, 265 Kan. 238, 960 P.2d 200 (1998), in support of the following statement of law: "Detaining a driver for even a few minutes in order to allow a drug-sniffing dog to arrive unreasonably extends the detention when the officer did not need additional time to ask exploratory questions or to write a traffic citation." 47 Kan. App. 2d at 877. This statement is true in the context of an ordinary traffic stop where an officer does not develop reasonable suspicion of a crime, as occurred in one of the cases the majority cites. See *Mitchell*, 265 Kan. at 245.

In the present case, however, my colleagues make this statement of law in analysis which *assumes Officer Powers had reasonable suspicion of criminal conduct* at the time of the detention. 47 Kan. App. 2d at 876-77. This leaves an inaccurate impression, in my opinion, which is not helped when the statement is taken out of context and included in Syllabus 12. My colleagues also quote the

passage directly from *Coleman* where, unlike the present case, no drug dog was at issue.

Kansas law clearly provides that where reasonable suspicion exists, a driver may be detained until a drug dog arrives at the scene, provided the detention is not excessive. See *State v. Anderson*, 281 Kan. 896, 903, 136 P.3d 406 (2006) ("The State asserts that the officers had ample information to support a reasonable suspicion that Anderson was engaged in illegal drug activity; thus they were permitted to extend Anderson's detention beyond the conclusion of the traffic stop to allow time for the drug dog sniff of the truck. We agree."); *State v. Golston*, 41 Kan. App. 2d 444, 448-54, 203 P.3d 10 (2009), *rev. denied* 289 Kan. 1282 (2010); see also *Lebrun*, 261 F.3d at 734 ("[T]he police cannot reasonably be expected to have dogs available for every police officer at every moment.").

I would reverse the district court's ruling suppressing the cocaine and drug paraphernalia. I would remand to the district court with directions to make findings on the controlling facts and, based on those factual findings, arrive at a legal conclusion regarding suppression.